### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

```
_____
                               :
UNITED STATES OF AMERICA       :
                               :     Crim. No. 12-636 (NLH/JS)
                               :
      v.                       :
                               :
                               :
                               :     MEMORANDUM
MELIDO FORTUNA, et al.         :       OPINION
                               :
                               :
_____:
```

**Hillman, District J.:**

Presently before the Court is the Motion to Dismiss the Indictment of Defendants Melido Fortuna, Jose G. Fortuna,[1] Kamran Khalid, Mohammad Rafiq, Muhammad Shafique and Mhand Hassam.[2]  For

---

[1]  Melido Fortuna and Jose G. Fortuna are brothers.  For purposes of clarity, the Court will hereinafter refer to Melido Fortuna as "Melido" and Jose G. Fortuna as "Jose."

[2]  The seven Defendants in this case are: Melido Fortuna, Jose G. Fortuna, Wael Khasharmeh, Muhammad Shafique, Kamran Khalid, Mohammad Rafiq, and Mhand Hassam.  Defendant Khasharmeh entered into a plea agreement with the United States on February 7, 2013.  [Docket No. 63.]  Defendant Melido filed the lead Motion to Dismiss the Indictment that is presently before the Court for disposition.  [Docket No. 59.]  Defendants Khalid, Rafiq, Shafique, and Jose either joined in this Motion or filed their own motions to dismiss the Indictment on the same grounds. [Docket Nos. 60, 65, 70, 72.]  At Oral Argument before the Court on March 27, 2013, Defendant Hassam expressed his intent to join in this Motion as well.  As such, the Court jointly considers Defendants' motions in this Memorandum Opinion.

the reasons set forth below, Defendants' Motion to Dismiss the Indictment is denied.[3]

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In order to place this matter in context, it is first necessary to note that each state in the country has the independent authority to decide whether or not to tax cigarettes and tobacco products within its boundaries.  The tax rates for these products vary significantly across state lines.  States located in the southern regions of the country where tobacco is grown and processed tend to have lower rates, while states in the northeastern United States — such as New Jersey — have higher tax rates.  In most states, a carton of cigarettes that has been properly assessed by state tax authorities typically has a stamp affixed to its outer packaging.  The tax rate disparities across the country have caused an incentive to create a black market for contraband cigarettes, which either bear fraudulent or no tax stamps altogether, and are smuggled

---

[3]    Subsumed within his Motion to Dismiss the Indictment, Defendant Melido likewise raised several other pretrial and evidentiary issues.  Defendant Khalid filed similar preliminary requests.  The United States has not responded to these arguments.  At Oral Argument, the parties jointly requested the Court to delay ruling on these pretrial motions, as its decision on the Motion to Dismiss the Indictment would impact future motions.  The Court acquiesced to the parties' request.  As such, the Court reserves ruling on the remainder of the preliminary issues until the pretrial conference presently scheduled for April 29, 2013.

from low-tax states to high-tax states.  These smuggling
operations have resulted in the loss of millions of dollars of
federal and state tax revenue each year.  In recognition of this
problem, Congress has enacted several federal laws to
criminalize such behavior.  Amongst them is the Contraband
Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341, et seq.,
which criminalizes the shipment, transport, receipt, possession,
sale, distribution, and purchase of contraband cigarettes.

The Indictment[4] in this matter charges the Defendants with
the unlawful purchase and distribution of over 10,000 contraband
cigarettes within the District of New Jersey and elsewhere.
Beginning in approximately September 2010, officers of the
Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")
began an investigation into cigarette smuggling operations in
New Jersey and New York.  At the time, the State of New Jersey
charged a tax of $2.70 per pack of cigarettes, or $27.00 per
carton.  Only cigarettes stamped with a valid New Jersey tax
stamp were permitted to be sold within the state.  As part of
the investigation, the ATF agents designed and executed an
undercover "sting" operation.  The cigarettes used in the sting
were purchased by the ATF from a tobacco manufacturer in North
Carolina, and were shipped — unstamped and pre-tax — to the ATF

---

[4]   A Superseding Indictment was filed on October 16, 2012.
[Docket No. 31.]

Field Office in New Jersey.  Upon receipt of the cigarettes, ATF officers transported them to a private entity in Pennsylvania, where they were stamped with counterfeit New Jersey tax stamps that the ATF agents were able to trace.  The counterfeit packs were then transported back to New Jersey, where they were sold by undercover agents to individuals involved in cigarette smuggling.

During the course of the investigation, Defendant Khasharmeh contacted a confidential informant working with the ATF (hereinafter "CS-1"), and expressed his interest in purchasing counterfeit cigarettes.  Following this initial contact, CS-1 and Khasharmeh engaged in a series of cigarette buys, all of which (except for one instance) took place at Khasharmeh's home in New Jersey.  In March of 2011, CS-1 gave Khasharmeh the telephone number of an undercover officer (hereinafter "UC-2")[5] posing as a cigarette smuggler from Virginia, and Khasharmeh contacted UC-2 to discuss the sale and delivery of cigarettes from Virginia.  During this conversation, Khasharmeh admitted to UC-2 that he already had one source of cigarettes in Virginia that was unrelated to the instant investigation.  Approximately one month later, Khasharmeh

---

[5]    To be clear, the Court identifies this undercover officer as UC-2, rather than UC-1, because this how he is identified in the Criminal Complaint.  A UC-1 has not been identified in the Criminal Complaint.

introduced UC-2 to Jose and Hassam because they had also
expressed interest in the criminal enterprise.  Following this
introduction, Jose introduced UC-2 to his brother Melido and his
father, Jose D. Fortuna,[6] and involved them in the unlawful
scheme as well.  In June of 2011, Khasharmeh introduced UC-2 and
another undercover officer (hereinafter "UC-3") to Shafique, who
in turn involved his son, Khalid, and business partner, Rafique,
in the operation.  Most of these individuals were retail
distributors of cigarettes that owned convenience stores
throughout New Jersey.  Over the course of approximately
eighteen months, they purchased 253,741 cartons of contraband
cigarettes from ATF agents.  The Defendants then sold the
cigarettes in their respective stores, or resold them to other
retail distributors.  The tax loss to the State of New Jersey as
a result of the conspiracy is alleged to be approximately
$6,851,655.00.

     A Criminal Complaint and arrest warrants for the Defendants
were issued on February 10, 2012.  On September 25, 2012, an
Indictment was returned charging the Defendants with violating
18 U.S.C. §§ 371 and 2342.  A Superseding Indictment was
subsequently returned on October 16, 2012.  On February 4, 2013,
Defendants filed the instant Omnibus Motion to Dismiss the
Indictment predicated on the theories that: (1) the ATF agents'

---

[6]     Jose D. Fortuna is not a defendant in this case.

conduct during the sting operation violated the clear language
of the CCTA; and (2) the manner in which the undercover
operation was carried out was so outrageous as to constitute a
violation of their Due Process rights.  [Docket No. 59.]  The
United States responded in opposition on February 20 and 21,
2013, respectively, and Defendants filed a Reply brief on
February 25, 2013.  [Docket Nos. 67-69.]  On March 27, 2013, the
Court held Oral Argument on this issue, at which time all
parties were given the opportunity to be heard and present any
additional evidence and arguments they wished the Court to
consider.[7]  After reviewing the parties' paper submissions and
considering the statements made at Oral Argument, the Court
orally ruled from the bench at the close of the hearing, wherein
it denied the Defendants' Motion to Dismiss the Indictment.  The
Court, however, reserved the right to supplement its oral ruling
by written opinion.  The present Memorandum Opinion therefore
serves as a supplement to the Court's oral ruling denying
Defendants' Motion.

## II.  APPLICABLE LAW

The CCTA makes it "unlawful for any person knowingly to
ship, transport, receive, possess, sell, distribute or purchase

---

[7]    At Oral Argument held before the Court on March 27, 2013,
Assistant Public Defender Lisa Evans Lewis orally argued the
Motion on behalf of all the Defendants.  Assistant United States
Attorney Diana Vondra Carrig appeared on behalf of the United
States.

contraband cigarettes." 18 U.S.C. § 2342(a); see also City of
N.Y. v. Milheim Attea & Bros., No.Civ.A.06-3620, 2009 U.S. Dist.
LEXIS 19351, at *4 (E.D.N.Y. Mar. 11, 2009). "Contraband
cigarettes" are defined under the Act as:

> A quantity in excess of 10,000 cigarettes, which bear
> no evidence of the payment of applicable State or
> local cigarette taxes in the State or locality where
> such cigarettes are found, if the State or local
> government requires a stamp . . . to be placed on . .
> . cigarettes to evidence payment of cigarette taxes[.]

18 U.S.C. § 2341(2). It has been recognized that "[a] violation
of a state or local cigarette tax law [ ] is a predicate to a
CCTA violation; [and] the state or local government must
'require' a stamp to be placed on cigarette packages as evidence
of payment of an applicable tax." Milheim, 2009 U.S. LEXIS at
*4 (internal citation omitted); see also United States v. Funds
from First Reg'l Bank, 639 F.Supp.2d 1203, 1206 (W.D. Wa. 2009).
It is undisputed amongst the parties here that, during the
relevant timeframe at issue, New Jersey state law required an
official state tax stamp to be affixed to each package of
cigarettes prior its sale.

The ATF is the agency vested with the authority to
"[i]nvestigate, administer, and enforce the laws related to . .
. tobacco," including, as is relevant here, laws "related to
trafficking in contraband cigarettes." 28 C.F.R. §§ 0.130 &

0.130(a)(1).[8]  Congress has specifically authorized the ATF to spend government funds to: (i) conduct undercover investigative operations as are necessary for the detection and prosecution of criminal activity, (ii) establish and operate business entities as part of such undercover operations, and (iii) use proceeds from such undercover operations to offset any reasonable expenses incurred in the course of the operations.  See United States v. Hasan, 846 F.Supp.2d 541, 546 (E.D. Va. 2012) (citing P.L. 102-395, Sec. 102(b)).

**III. LEGAL ANALYSIS**

Defendants set forth two reasons for why they believe the Indictment must be dismissed under these circumstances: (1) the actions of ATF agents during the course of the sting operation violated the clear language of the CCTA, and it is therefore a legal impossibility to convict them under a law which the government itself violated; and (2) the government's conduct during the operation was so outrageous that it constituted a violation of Due Process.  In response, the United States argues that the ATF was within its congressionally-prescribed authority when it conducted the investigation, and that Defendants' reading of the CCTA is mistaken and would yield absurd results.

---

[8]     Congress has given the Attorney General broad authority to conduct law enforcement operations, including, inter alia, the power to appoint officials "to detect and prosecute crimes against the United States."  28 U.S.C. § 533(1).  The ATF, of course, is such an agency or official.

The United States further asserts that binding Supreme Court and Third Circuit precedent clearly indicate that the government's conduct in this case was not so outrageous or shocking so as to constitute a violation of Due Process.  The Court addresses each of these arguments in turn below.

**A.   The Government's Conduct Did Not Violate the Clear Language of the CCTA**

As indicated above, the CCTA makes it "unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute or purchase contraband cigarettes."  18 U.S.C. § 2342(a).  Importantly, Congress specifically excluded from the "contraband cigarettes" definition cigarettes within the possession of any of the following persons:

> (A)   A person holding a permit issued pursuant to chapter 52 of the Internal Revenue Code of 1954 as a manufacturer of tobacco products or as an export warehouse proprietor, or a person operating a customs bonded warehouse pursuant to section 311 or 555 of the Tariff Act of 1930 or an agent of such person;
>
> (B)   A common or contract carrier transporting the cigarettes involved under a proper bill of lading or freight bill which states the quantity, source, and destination of such cigarettes;
>
> (C)   A person (i) who is licensed or otherwise authorized by the State where the cigarettes are found to account for and pay cigarette taxes imposed by such State; and (ii) who has complied with the accounting and payment requirements relating to such license or authorization with respect to the cigarettes involved; or

> (D) An officer, employee, or other agent of the United States or a State, or any department, agency, or instrumentality of the United States or a State [] having possession of such cigarettes in connection with the performance of official duties[.]

18 U.S.C. § 2341(2). Subsection (D) is the specific provision at issue here. The United States asserts that that the cigarettes possessed and utilized by the ATF agents in this case fall squarely within this exemption because the agents were executing their official duties during the undercover investigation. Thus, according to the United States, since the cigarettes possessed by the ATF during the investigation do not constitute contraband under the statute, the agents' subsequent use of them in the undercover operation was lawful. Stated differently, so long as the officers were executing their official duties when they possessed the cigarettes, they were likewise lawfully permitted to transport, sell, and distribute those cigarettes in accordance with those duties. Defendants, on the other hand, allege that the clear language of the CCTA limited the ATF agents to merely possessing the cigarettes in connection with their official duties, and did not permit them to otherwise ship, transport, distribute, or sell them. According to Defendants, the government's investigation — which was "directly responsible for the introduction of millions of contraband cigarettes into the stream of commerce with no

intention to track or recover [them]" — far exceeded the statute's permissible scope, and it is therefore a legal impossibility to convict them for breaking a law which the government itself violated. (Def. Melido Fortuna Br. at 9.)

This issue was recently directly addressed by our sister court in the Eastern District of Virginia in United States v. Hasan, 846 F.Supp.2d 541 (E.D. Va. 2012) under largely similar factual circumstances. In that case, the ATF conducted a lengthy two-year undercover investigation into cigarette smuggling along the East Coast. Id. at 543. During the investigation, agents participated in numerous undercover transactions, including the sale of large quantities of taxed and untaxed cigarettes to Defendant Hasan and his co-conspirators. Id. The operation revealed that, on multiple occasions, Hasan and his co-conspirators illegally transported cigarettes from Virginia to New York for distribution purposes. Id. at 543-44. As a result of the fraudulent scheme, the State of New York was deprived of more than $1.1 million in tax revenue. Id. Hasan and his co-conspirators were eventually arrested and charged with violating 18 U.S.C. §§ 371 and 2342(a). Id. at 544. Hasan moved to dismiss the indictment on the grounds that, inter alia, the ATF's undercover operation caused its agents to engage in activity which fell outside the CCTA's scope. Id. at 547. Hasan specifically argued that, the

agents not only possessed, but also distributed and sold large quantities of contraband cigarettes during the investigation, and that these additional actions violated the statute.  Id.

The court, however, disagreed.  Rather, it found that, in crafting the "performance of official duties" exception in § 2341(2)(D), Congress undoubtedly accounted for situations where agents' official duties would require them to engage in actions that would otherwise violate the CCTA, including the shipment, transport, receipt, possession, sale, distribution, and purchase of contraband cigarettes.  Id.  ("In making this exception, Congress clearly recognized that there might well be occasions, as here, when the official duties of law enforcement officers require those officers to engage in actions that would otherwise violate the statute[.]").  Thus, the Hasan Court reasoned that, "because the undercover ATF agents possessed and distributed the contraband cigarettes in connection with the performance of [their] official duties, it necessarily follows, contrary to Hasan's contention, that the agents' possession and distribution of those cigarettes violated neither the specific statute at issue nor any other criminal statute."  Id. (footnote & internal quotation marks omitted).

This Court finds the reasoning utilized by the Hasan Court to be highly persuasive, and, as indicated at the March 27, 2013

Oral Argument, adopts it herein.[9]  During the undercover operation in this matter, the ATF agents were exercising their official duties, and the cigarettes that they used in the sting were therefore not classified as contraband pursuant to § 2341(2)(D).  It follows that, since the cigarettes were not contraband, the officers' subsequent transport, use, and distribution of them did not violate the terms of the CCTA.[10]

Moreover, even if the conduct at issue here did not fall within the statutory exemption of § 2342(D), the Defendants' proffered statutory interpretation nonetheless lacks merit

---

[9]   The Court notes that the district court's decision in <u>Hasan</u> has been appealed and is presently pending before the Fourth Circuit Court of Appeals.  The appellate docket reflects that the Fourth Circuit heard oral argument on the case on March 28, 2013.  As of the date of the issuance of this Memorandum Opinion and Order, however, the Fourth Circuit has not yet rendered its decision.

[10]   At Oral Argument, Defendants argued that other statutory sections and federal regulations — namely, 21 U.S.C. § 885 and 21 C.F.R. § 1301.24 — permit law enforcement officers to distribute controlled substances in accordance with their official duties, while the CCTA contains no such broad grant of immunity.  The premise of Defendants' argument appears to be that, had Congress intended for law enforcement agents to be able to distribute contraband cigarettes in accordance with their official duties, it would have expressly said as much like it did in other statutory and regulatory provisions.  These other provisions are, however, irrelevant here because they relate to narcotics and controlled substances.  Had Congress not specifically addressed officer immunity in contraband cigarette smuggling in the language of the CCTA, then the Court may be more inclined to give merit to Defendants' argument and look to other statutes.  Congress did, however, address this issue when it promulgated the CCTA.  The Court therefore need not look to other statutes for guidance when Congress's intent in drafting the CCTA is readily available to it.

because it would render absurd results.  Indeed, Defendants'
narrow reading of the statute is quite nonsensical, as it would
require law enforcement conducting sting operations to merely
acquire and retain possession of tainted goods, without being
able to interact with targets, observe their participation in
criminal activity, and follow objects of the conspiracy.  In
fact, under Defendants' interpretation, no type of meaningful
investigation into contraband cigarette smuggling could ever
occur since the alleged contraband could remain in the agency's
possession indefinitely.  Although the Court acknowledges that
Congress could have been clearer when it drafted this provision
of the CCTA, it is highly unlikely that it meant to hinder law
enforcement's efforts in eradicating cigarette smuggling when it
drafted the statute.  The Third Circuit has repeatedly
recognized that courts should "construe statutes sensibly and
avoid constructions which yield absurd or unjust results."
United States v. Fontaine, 697 F.3d 221, 228 (3d Cir. 2012)
(citing In re Chapman, 166 U.S. 661, 667 (1897); United States
v. McKie, 112 F.3d 626, 631 (3d Cir. 1997); Gov't of the V.I. v.
Berry, 604 F.2d 221 (3d Cir. 1979)).  In order to successfully
and plausibly execute the undercover investigation in this case,
the ATF agents had to engage in conduct beyond sole possession
of the cigarettes, including their shipment, transport, sale,
and distribution because they otherwise would not have been able

14

to facilitate events that allowed them to competently investigate the criminal conduct and eventually dismantle the illegal enterprise. As such, the Court declines to accept Defendants' submitted interpretation of the CCTA. To find otherwise would lead to illogical and incongruous outcomes, and would seriously hinder the investigatory and enforcement authority afforded to law enforcement by Congress and the Attorney General.[11]

Thus, the Court finds that the conduct of the government in this case in conducting its undercover operation did not, in and of itself, violate the CCTA. Accordingly, Defendants' request to dismiss the Indictment on these grounds is denied.

**B.  The Government's Conduct Was Not So Outrageous So As to Constitute a Violation of the Due Process Clause**

Defendants further argue that the Indictment must be dismissed because the methods employed by the ATF agents during

---

[11]  Defendants' proffered statutory interpretation is further undermined when considering its application to the other three exemptions provided by Congress in § 2341(2). Applying Defendants' logic to the exemptions provided in § 2341(2)(A) through (C), cigarette manufacturers, common carriers, cigarette warehouse operators, and individuals licensed to account for payment of cigarette taxes could likewise potentially be found criminally liable for engaging in conduct beyond mere possession of cigarettes. It is highly illogical to presume that Congress intended such individuals — especially common carriers and manufacturers — to solely possess cigarettes without being able to transport and distribute them. Thus, application of Defendants' purported reasoning to the other statutory exemptions provided in § 2342(2) further indicates why Defendants' interpretation would yield absurd results.

the investigation amounted to outrageous government conduct in
violation of the Due Process Clause.  More specifically,
Defendants contend that the ATF agents' conduct was outrageous
because the contraband left their custody and control, and
caused the State of New Jersey and its legitimate business
owners to be deprived of millions of dollars in revenue.
Defendants also assert that the government's conduct was
egregious because the ATF at times "fronted" money to them in
order to facilitate the illegal enterprise and keep it from
collapsing.  In response, the United States asserts that, when
considered alongside binding precedent, the government's conduct
in this case was clearly not so outrageous or shocking so as to
violate Due Process, and that the ATF agents acted within the
authority delegated to them by Congress and the Attorney General
during the operation.

        "An outrageous government conduct defense examines whether
a defendant's due process rights have been violated because the
government created the crime for the sole purpose of obtaining a
conviction."  United States v. Tolentino, 486 F. App'x 286, 288
(3d Cir. 2012) (citing United States v. Pitt, 193 F.3d 751, 759-
60 (3d Cir. 1999)).[12]  The federal circuits, including our Court

---

[12]     The outrageous government conduct defense is often viewed
in conjunction with the entrapment defense.  United States v.
Lakhani, 480 F.3d 171, 177 (3d Cir. 2007) (noting that the
entrapment and due process defenses are "related").  The two

of Appeals, have recognized that "[a]lthough the defense of

defenses have often been dually asserted by defendants challenging their indictments or convictions, and the line differentiating between the two has not always been bright.  In the 1970s, the Supreme Court laid to rest the confusion between the two in United States v. Russell, 411 U.S. 423 (1973) and Hampton v. United States, 425 U.S. 484 (1976).  In Russell, the Supreme Court recognized that the entrapment defense only comes into play "when the Government's deception actually implants the criminal design in the mind of the defendant," because entrapment solely focuses on "the intent or predisposition of the defendant to commit the crime." Russell, 411 U.S. at 429, 436. In its discussion, however, the Court noted the following caveat: "While we may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed." Id. at 431-32. This statement seemed to indicate the possibility that, should the government's conduct in another case at some point in the future rise to the level of outrageousness, then constitutional due process principles could fill in where the entrapment defense was lacking.

    That possibility was confirmed by the Supreme Court three years later in Hampton.  Justice Powell, writing for the concurrence, drew the line differentiating between entrapment and due process that has since been adopted by the federal courts.  See Lakhani, 480 F.3d at 178 n.9 (3d Cir. 2007) (internal citations omitted) ("It is Justice Powell's conception of the doctrine and terms that our Court has employed since Hampton[.]").  In separating the two defenses, Justice Powell recognized that entrapment focuses on the defendant's predisposition to commit the crime, whereas the outrageous government conduct defense looks to the government's conduct. Hampton, 425 U.S. at 492-95 (Powell, J., concurring).

    As noted above, the entrapment and outrageous government conduct defenses are frequently jointly raised by criminal defendants.  Defendants here, however, have not raised entrapment as a defense.  The distinction between the two defenses was, however, briefly discussed at the Oral Argument on March 27, 2013.  As such, the Court merely raises the above points to give context to the outrageous government conduct defense, and to make the basis of its present ruling more clear. It should be made clear from the outset that the Court's instant ruling is not predicated on the entrapment defense, but rather solely relates to outrageous government conduct.

outrageous government conduct is 'often invoked by defendants,
[it] is rarely applied by courts.'"  Tolentino, 486 F. App'x at
288 (quoting United States v. Voigt, 89 F.3d 1050, 1065 (3d Cir.
1996)); see also United States v. Santana, 6 F.3d 1, 4 (1st Cir.
1993) ("The banner of outrageous misconduct is often raised but
seldom saluted."); United States v. Al Kassar, 660 F.3d 108,
121-122 (2d Cir. 2012); United States v. Goodwin, 854 F.2d 33,
37 (4th Cir. 1988); United States v. Sandlin, 589 F.3d 749, 759
(5th Cir. 2009); United States v. Nazem Akl, 758 F.2d 654 (6th
Cir. 1985); United States v. Lopeztegui, 230 F.3d 1000, 1003
(7th Cir. 2000); United States v. Gleason, 980 F.2d 1183, 1186-
87 (8th Cir. 1992); United States v. Marcello, 731 F.2d 1354,
1357 (9th Cir. 1984); United States v. Mosley, 965 F.2d 906, 909
(10th Cir. 1992); United States v. Lopez-Cruz, 170 F. App'x 634,
636 (11th Cir. 2006); United States v. Walls, 70 F.3d 1323, 1329
(D.D.C. 1995).  Indeed, the defense has been identified as
"moribund" and "hanging by a thread," and is "to be invoked only
in the face of 'the most intolerable government conduct[.]'"
Lakhani, 480 F.3d at 180-81 (quoting United States v. Jannotti,
673 F.2d 578, 608 (3d Cir. 1982) (en banc)) (further citation
omitted).  In the past forty years, the defense has rarely
resulted in the overturning of convictions or dismissal of
indictments.  In fact, despite being confronted with the issue
several times, the Third Circuit has only once reversed a

18

defendant's conviction based on the defense in United States v. Twigg, 588 F.2d 373 (3d Cir. 1978).

In Twigg, a confidential government witness, at the request of the law enforcement officials, initiated contact with one of the defendants to discuss establishing a drug laboratory.  Id. at 376.  Not only did the government witness initiate the idea, but he also acquired and paid the rent for a production site, and supplied the necessary equipment and raw materials, some of which were otherwise extremely difficult to obtain.  Id. Moreover, the government witness was "completely in charge of [running] the entire laboratory," and "[a]ny production assistance provided by [the defendants] was minor and at [his] specific direction."  Id.  In assessing the government's inception and facilitation of the criminal conduct, the Third Circuit had "no trouble [] concluding that the governmental involvement in the criminal activities . . . reached a demonstrable level of outrageousness."  Id. at 380 (internal quotation marks omitted).  In so finding, the Court of Appeals placed significant emphasis on the fact that "the illicit plan did not originate with the criminal defendants," but instead appeared engineered to specifically target and involve them. Id. at 381.  Absent the government's proposal and its willingness to financially and procedurally facilitate the venture, it was "unclear whether the parties [otherwise] had the

means or the money" to carry out the enterprise on their own.

Id. at 380.  Indeed, the Twigg Court found that:

> [T]he DEA agents deceptively implanted the criminal
> design in [the defendant's] mind.  They set him up,
> encouraged him, provided the essential supplies and
> technical expertise, and when he and [the government
> witness] encountered difficulties in consummating the
> crime, they assisted in finding solutions. This
> egregious conduct on the part of government agents
> generated new crimes by the defendant merely for the
> sake of pressing criminal charges against him when, as
> far as the record reveals, he was lawfully and
> peacefully minding his own affairs. Fundamental
> fairness does not permit us to countenance such
> actions by law enforcement officials and prosecution
> for a crime so fomented by them will be barred.

Id.  As such, the Court of Appeals found that the defendants'

Due Process rights were violated as a result of the extensive

and overreaching conduct on the part of the government during

its investigation.

   In the thirty-five years since its ruling in Twigg,

however, the Third Circuit has not found a violation of Due

Process based on the outrageous government conduct defense.  A

review of the caselaw indicates that the Court of Appeals, as

well as the district courts within its jurisdiction, are

extremely hesitant to invoke the defense.  See Lakhani, 480 F.3d

at 180 ("[T]he judiciary is extremely hesitant to find law

enforcement conduct so offensive that it violates the Due

Process Clause.") (internal citation omitted); see also United

States v. Salahuddin, Crim.No.10-104, 2013 U.S. Dist. LEXIS

37632, at *24-29 (D.N.J. Mar. 19, 2013); United States v.
Muntasir, Crim.No.12-524, 2012 U.S. Dist. LEXIS 148369, at *8-10
(D.N.J. Oct. 16, 2012); United States v. Manzo, 714 F.Supp.2d
486, 501 (D.N.J. 2010); United States v. Dilworth, Crim.No.10-
730, 2012 U.S. Dist. LEXIS 57118, at *8-9 (D.N.J. Apr. 23,
2012)(Simandle, J.).  In fact, in United States v. Nolan-Cooper,
the Third Circuit distinguished Twigg by explaining that it
"involved a quite egregious case of government overinvolvement
in which the government's undercover operative essentially
concocted and conducted the entire illicit scheme."  155 F.3d
221, 230 (3d Cir. 1998).  Notably, the Nolan-Cooper Court
recognized that Twigg did not involve "a situation where an
undercover agent [became] involved in the operation after the
criminal scheme [was] created," but rather involved
circumstances where the agent was responsible for the inception
of the unlawful idea in the defendant's mind.  Id.  Therefore,
it has been recognized that, "[s]ince Twigg and Nolan-Cooper, it
is now clear that 'in order for the claim of outrageous
government conduct to succeed, a government agent has to
initiate the criminal conduct with the goal of obtaining a
conviction and must draw the defendant into the illegal activity
to bring about that goal.'"  United States v. Dentico,
Crim.No.05-6907, 2006 U.S. Dist. LEXIS 16699, at *11-12 (D.N.J.
Mar. 20, 2006) (quoting United States v. Pitt, 193 F.3d 751, 761

21

(3d Cir. 1999)).  More so, "the challenged conduct must be
shocking, outrageous, and clearly intolerable, [thus]
violat[ing] our sense of fundamental fairness or shock[ing] the
universal sense of justice."  Pitt, 193 F.3d at 761-762 (citing
Russell, 411 U.S. at 432).  Indeed, the Third Circuit has been
highly loathe to permit defendants to benefit from the defense,
even in cases where the government has actively participated in
illegal activity that is potentially more egregious and
questionable than that presented in the instant case.

Nolan-Cooper itself is an example of the Third Circuit's
reluctance to breathe life into the outrageous government
conduct defense.  In that case, upon receiving information that
an attorney in Philadelphia had been laundering illicit drug
proceeds, government agents set up a sting operation that
specifically targeted her.  155 F.3d at 224.  Over the course of
the thirteen-month investigation, however, the female attorney
and a male undercover agent became intimately acquainted and
engaged in sexual intercourse on at least one occasion.  Id.
The attorney subsequently moved to dismiss her indictment on the
grounds that the agent's relationship and contact with her
crossed the bounds of permissible investigatory activity.  Id.
The Court of Appeals declined to do so, however, because it
recognized that "the agent's sexual exploits served no

investigatory purpose, and [] there was no evidence of
discussions among the investigating agents and their superiors
concerning the use of sex to induce [the defendant's] continued
participation in the illicit scheme." Id. at 225.

In another case, United States v. Lakhani, the defendant
was an arms dealer engaged in a criminal enterprise that
provided weapons and services to terrorists, including the
illegal import of missiles to the United States. 480 F.3d at
174-177. Notably, the defendant in Lakhani became involved in
the criminal enterprise at the suggestion of a government
informant, and he therefore argued that his situation was akin
to that of the defendants in Twigg. Id. at 175, 182. The Third
Circuit, however, found Twigg to be distinguishable because the
Lakhani defendant used his own knowledge and contacts to
facilitate the illegal scheme, and, unlike the Twigg defendants,
likely would have engaged in the criminal activity regardless of
his interaction with the informant:

> [T]he evidence indicates that, as in Twigg, it was the
> Government agent [] who first suggested the criminal
> activity. Beyond that, however, significant
> dissimilarities abound. Rather than the Government
> agent being "completely in charge" and "furnish[ing]
> all of the [relevant] experience," as in Twigg, here
> it was Lakhani who used his *own* knowledge of the arms
> business for the benefit of the illegal scheme.
> Lakhani traveled to Russia and the Ukraine on his own
> tab, communicated with no fewer than three separate
> arms companies, created fraudulent shipping documents,
> and deployed his own money laundering network. In

23

> addition, unlike in Twigg, where we saw little
> predisposition on the part of the defendants, there is
> much to suggest otherwise in Lakhani's case[.]
> [Finally,] [t]he fact that the Government, as here, is
> on all sides of a transaction — both buyer and seller
> - does not a due process violation make.

Id. at 182 (internal citations omitted) (emphasis in original).

Thus, even in circumstances in which the government was involved

on both sides of the transaction and initially engaged the

defendant in the scheme, the Court of Appeals has declined to

find such conduct outrageous.

In yet another case, United States v. Beverly, 723 F.2d 11

(3d Cir. 1983), an ATF agent approached the defendants and

stated that he was looking for someone willing to burn down a

government building.  Id. at 12.  Upon the defendants'

acceptance of the offer to set the fire, the agents supplied all

the necessary materials, helped the defendants disguise

themselves as painters, drove the defendants to the site in a

government vehicle, and watched as they set fire to the

building.  Id.  Even under these circumstances, the Third

Circuit found no showing of outrageous government conduct.  Id.

at 13 ("We are not prepared to conclude that the police conduct

in this case shocked the conscience of the Court or reached that

demonstrable level of outrageousness necessary to compel

acquittal so as to protect the Constitution.") (internal

citations & quotation marks omitted).

It is also worth mentioning that the Hasan Court in the Fourth Circuit recently held that the government's conduct during a significantly similar undercover cigarette smuggling investigation was neither shocking nor offensive to traditional notions of fundamental fairness.  United States v. Hasan, 846 F.Supp.2d 541, 546 (E.D. Va. 2012).  The court specifically recognized that: "by engaging in actions expressly authorized by Congress, including specifically the establishment of an undercover 'business' of selling untaxed, unstamped cigarettes . . . the ATF agents clearly did not engage in outrageous conduct violative of the Due Process Clause."  Id.  The Hasan Court further noted that the length of the investigation — two years — did not by itself render the operation outrageous.  Id. at 548.  Indeed, the court recognized that "[f]ederal investigations into large-scale criminal enterprises frequently take several years to complete," and the length of the ATF investigation was "reasonable and necessary" to provide it with adequate time to fully ascertain the scope and extent of the conspiracy.  Id. at 548-49.

With these cases serving as a backdrop, this Court is readily able to ascertain that the government's conduct here did not rise to the level of outrageousness so as to warrant a violation of Due Process.  Although the ATF agents' involvement

25

in the facilitation of the unlawful enterprise was substantial, it cannot be said to rise to the level of "shocking, outrageous, and clearly intolerable" behavior.  The evidence in the record supports a finding that the government did not concoct the entire scheme and then approach the Defendants in an attempt to lure them into the criminal enterprise.  Rather, criminal activity was already afoot when Defendant Khasharmeh initially reached out to CS-1 to inquire about purchasing contraband cigarettes.  In fact, during the investigation, Khashmarmeh admitted to undercover agents that he and the Fortuna family had been engaging in illegal cigarette sales "for years," and likewise admitted to having his own contacts and sources of contraband cigarettes aside from those utilized and known to the investigating agents.  Furthermore, the United States represented to the Court at Oral Argument that, aside from the cigarettes with counterfeit stamps supplied by the ATF, the Defendants themselves operated a counterfeit stamping operation out of their homes, where they ironed forged tax stamps onto cigarette cartons.  Thus, unlike the defendants in Twigg who had little predisposition to engage in criminal activity absent the government's conduct, the evidence here indicates that the Defendants' behavior was part and parcel of other criminal conduct, and was likely to occur regardless of the ATF's actions.

The record also reflects that all of the Defendants freely and fully participated in the alleged conspiracy and conducted acts in furtherance of it, such as supplying money, transporting the cigarettes, and assisting in the loading and unloading of contraband.  Following Khasharmeh's initial contact with CS-1, the two engaged in a series of buys, a majority of which took place at Khasharmeh's home in New Jersey, and Khasharmeh — of his own volition — contacted other undercover agents to further discuss the sale and delivery of cigarettes.  Khasharmeh subsequently brought Jose, Hasam, and Shafique into the enterprise, who in turn recruited Melido, Khalid, and Rafique. As such, the evidence in no way suggests that the Defendants were lawfully and peacefully minding their own affairs, and were unfairly lured into fomenting this conspiracy by the government. Nor does the evidence show that the agents were the masterminds of the scheme that planted the seeds of inception into the Defendants' minds.  Rather, it appears as though Khasharmeh served as the scheme's primary architect, as he initiated contact, continuously recruited new participants into the fold, and facilitated a substantial number of the overall illegal transactions.

The Court is likewise unconvinced by Defendants' argument that the officers' conduct was outrageous because, over the

substantial period of eighteen months, they flooded New Jersey's
stream of commerce with illegal cigarettes that deprived the
state and its legitimate business owners of millions of dollars
in revenue.  First, it should be noted that, unlike the illegal
narcotics, missiles and weapons, and difficult to obtain
chemicals provided by the government agents in Twigg, Beverly,
and Lakhani, the cigarettes provided by the ATF agents here were
— aside from the fact that they were not properly taxed — a
lawful commodity.  See Hasan, 846 F.Supp.2d at 548 ("[T]his is
especially true given the important distinction between the
government's undercover distribution of illegal narcotics . . .
and contraband cigarettes, which, apart from being untaxed
and/or unstamped, are otherwise legal commodities.").  Second,
although the ATF agents supplied cigarettes and sometimes
fronted funds for the operation, the Defendants here operated
their own stores from which the sales and deliveries took place,
solicited and maintained their own clients for the cigarettes,
and admitted to having other contacts in the black market
besides the undercover agents.  Thus, the Defendants' own
actions cut against a finding that the criminal enterprise here
was primarily orchestrated by the government and specifically
targeted them.  Third, as acknowledged by our sister court in
Hasan, the length of time of an investigation is insufficient in
and of itself to render government conduct outrageous, as

federal investigations into criminal enterprises often take several years to complete in order to determine the full scope of the conspiracy.  See id. at 548-49; see also Lakhani, 480 F.3d at 182-83 ("[W]here the Government is investigating fleeting and elusive crimes, it may require more extreme methods of investigating, including the supply of ingredients.") (internal quotation marks omitted).  Indeed, the United States has represented to the Court that the investigation was prolonged partially because other criminal conduct aside from cigarette smuggling — including money laundering, unlawful possession of firearms and a silencer, the making of serious threats, and potential international arms dealing — came to light during the undercover operation and needed to be further investigated.  As such, the time span of the investigation alone does not lend to a finding of outrageous government conduct.

As to Defendants' assertions that the agents' conduct was outrageous because the contraband left their custody and control and caused the State and its legitimate business owners to be deprived of significant revenue, the Court recognizes that this same argument was discredited by the Hasan Court.  See Hasan, 846 F.Supp.2d at 547.  More specifically, the court noted that the fact that the ATF agents allowed the defendant and his co-conspirators to walk away with untaxed and unstamped cigarettes

29

did not render the conduct outrageous because such measures are often necessary to effectuate undercover operations.  Id. at 547-48.  The court specifically recognized that such actions regularly take place in the narcotics context, and that challenges to such conduct have been routinely rejected by the courts.  Id. at 547.  The same logic applies to this case.  The ATF agents' actions in furtherance of the operation were necessary and reasonable in order to make it plausible and help ascertain the identity and roles of the various members of the conspiracy.  Merely permitting the cigarettes to "walk" into the stream of commerce does not automatically equate to a Due Process violation.  Rather, this represents a broad effort by law enforcement, in accordance with the duties delegated to them by the Attorney General and Congress, to uncover and dismantle what they had reason to believe was an extensive network of counterfeiting stamps and selling contraband cigarettes.

Finally, with respect to the argument that the ATF's conduct was outrageous because it flooded the market with untaxed or unstamped cigarettes, the Court notes — as it did at Oral Argument — that this is an issue best left to the discretion of the State of New Jersey.  As proffered by the United States at the hearing, the State was intimately involved in both the formulation and implementation of this undercover

30

operation.  A known side effect of the operation was the potential loss of significant tax revenue, which the record indicates that the State willingly accepted.  As such, given that this decision was well within the wisdom of state authorities, this federal court declines to pass judgment on it here.[13]

In sum, the Court finds that the government's conduct in this case did not cross into the forbidden territory of outrageousness.  It was neither shocking nor offensive to traditional notions of fundamental fairness.  The government did not serve as the mastermind of the criminal enterprise, nor was it primarily responsible for the scheme's execution.  Further, the Defendants were not lawfully and peacefully minding their own affairs when the government stepped onto the scene.  To the contrary, there is evidence in the record to strongly suggest that criminal activity was already underway at the point of the government's initial contact with one of the Defendants.  As such, the Court cannot find that the Due Process Clause was violated under these circumstances.  Accordingly, the Court will not dismiss the Indictment on this basis, and Defendants' Motion

---

[13]   Of course, should a conviction ultimately be obtained, the Court's present statements should in no way be construed to preclude Defendants from making arguments at sentencing with respect to the loss calculation or whether a departure or variance would be appropriate on these grounds.

predicated on the outrageous government conduct defense is denied.

**IV.   CONCLUSION**

For the reasons set forth above and expressed by the Court in its ruling issued from the bench at the March 27, 2013 Oral Argument, the Indictment against the Defendants in this criminal matter will not be dismissed.  Accordingly, Defendants' Motion to this effect is denied.

An appropriate Order follows.

_/s/ Noel L. Hillman_____

At Camden, New Jersey                NOEL L. HILLMAN, U.S.D.J.

Dated: April 22, 2013___